BENNIE RUDNER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

R. F. JACOBSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 102112, 102125.   Promulgated June 4, 1942.

*John E. O. Feller, C. P. A.*, for the petitioners.
*W. W. Kerr, Esq.*, for the respondent.

**OPINION.**

Turner: The statute provides in section 23 (k) of the Revenue Act of 1936 that in computing net income there shall be allowed as deductions "Debts ascertained to be worthless and charged off within the taxable year (or, in the discretion of the Commissioner, a reasonable addition to a reserve for bad debts)." Regulations promulgated thereunder provide that a taxpayer may change from one method of accounting for bad debts to the other only upon permission granted by the Commissioner of Internal Revenue. Art. 23 (k)-1, Regulations 94.

The R & J Furniture Co. had regularly followed the specific charge-off method in computing bad debt deductions, but on October 27, 1937, obtained the consent of the Commissioner to change to the reserve method. The change was not made, however, until December 31, 1937, by which date debts determined to be bad and charged off during 1937 totaled $40,610.68. On December 31, 1937, a reserve for bad debts in the amount of $96,234.96 was set up on the partner-

ship books and the debts previously determined to be bad and charged off, in the amount of $40,610.68, were charged thereto, leaving a balance in the reserve of $55,624.28, the said balance being equal to 20 percent of the accounts receivable outstanding on the books at December 31, 1937. With respect to the sufficiency of the reserve so carried forward to 1938, the facts show that, after the debts determined in 1938 to be bad had been charged to the reserve and the bad debt recoveries during 1938 had been credited thereto, the net charge to the reserve during 1938 was $50,742.78, indicating that the estimate made by the partnership at December 31, 1937, in respect of its bad debt requirements was reasonably accurate.

The petitioners claim that, by reason of the change from the specific charge-off method to the reserve method, the partnership properly set up as a reserve at December 31, 1937, the sum of $96,234.96, and that in computing its net income for 1937 it is entitled, under the statute and the regulations, to the deduction of the full amount, even though the facts show that the said amount was designed to and in fact was sufficient to cover its bad debt needs not only for 1937, but for 1938 as well. *Rhode Island Hospital Trust Co.* v. *Commissioner*, 29 Fed. (2d) 339, and *First National Bank of Omaha* v. *Commissioner*, 49 Fed. (2d) 70, are cited in support of this contention.

Counsel for the respondent takes the position that the Commissioner, in the exercise of the discretion vested in him by statute, determined that "a reasonable addition" to the partnership reserve for bad debts for 1937 was $40,433.64, that amount being equal to 10 percent of the gross sales of the partnership for 1937 and substantially the same as the actual bad debt requirements for that year; that such determination is in fact reasonable and should not therefore be disturbed.

Prior to 1921 a deduction for bad debts could be taken only by the specific charge-off method, and for the first time the Revenue Act of 1921 permitted a determination of the deduction by the reserve method. Under article 151 of the regulations promulgated under the said act taxpayers were permitted, for 1921, to elect either of the two methods, but it was provided that thereafter no change might be made without permission granted by the Commissioner. The method of effecting the change was prescribed by article 155, wherein it was provided that a taxpayer electing to change to the reserve method should determine and set up the amount of the reserve "that should reasonably have been set up as at December 31, 1920 (which shall not be deducted in computing net income), and in respect of 1921 and subsequent years may add a reasonable addition to such reserve and deduct the amount in computing taxable net income." It was further provided that debts outstanding at December 31, 1920, which became worthless and uncollectible during

1921 should be charged against the reserve set up but that such debts should likewise be deductible for 1921. The result was to allow as a bad debt deduction in the year of the change the debts arising prior to January 1 which became worthless and uncollectible during the year plus the amount credited in or at the end of the year to the reserve to cover experienced and anticipated bad debt losses in the accounts arising after January 1.

One of the first cases, if not the first case, involving the change from the specific charge-off method to the reserve method of accounting for bad debts was *Transatlantic Clock & Watch Co.*, 3 B. T. A. 1064. There the taxpayer in the year of the change charged off bad debts in the amount of $4,302.14 and at the close of the year set up a reserve in the amount of $5,000 to cover anticipated bad debt losses in respect of the accounts then outstanding and claimed as a bad debt deduction for the year the sum of the two items, or $9,302.14. The respondent determined that the petitioner had not complied with the regulations so as to indicate an election to account for bad debts by the reserve method and allowed the deduction claimed only to the extent of the debts specifically charged off. The Board waived this argument aside and took the position that the real question was whether the taxpayer should be permitted, in the year of such change, to deduct both the bad debts charged off and the amount added to or placed in a bad debt reserve, and declared that a taxpayer could not have both but was limited to one or the other. It was concluded that the taxpayer had elected to account for bad debts by the reserve method and that $7,569.03 was a reasonable amount to set up in the reserve and was deductible. By a tabulation set forth in the opinion, however, the Board indicated that the reserve set up should be sufficient not only to meet anticipated bad debt losses in the accounts receivable outstanding as of the date when the reserve was set up but should also be sufficient to absorb debts which had been ascertained to be worthless and specifically charged off during the year prior to the setting up of the reserve. The net result of this ruling was the allowance in full of debts specifically charged off during the year of the change plus a reserve in a lesser amount than that claimed and set up by the taxpayer at the close of the year. But, said the Board, this total must be regarded solely and only as "a reasonable addition" to the reserve for the year of the change and no part is to be regarded as debts determined to be bad and charged off the books. Since its promulgation the Board has consistently cited *Transatlantic Clock & Watch Co.* for the proposition that a taxpayer may not have a bad debt deduction by both the specific charge-off method and the reserve method, but for a considerable time refused in varying degrees, without noting the difference or any particular reason therefor, to include in the reserve allowed an amount sufficient to absorb the

bad debts charged off during the year, as was pointedly done in *Transatlantic Clock & Watch Co.* See *Rhode Island Hospital Trust Co.*, 8 B. T. A. 555; reversed, 29 Fed. (2d) 339; *Thomas Henry, Inc.*, 13 B. T. A. 1234; and *First National Bank of Omaha*, 17 B. T. A. 1358; reversed, 49 Fed. (2d) 70. The courts, in reversing *Rhode Island Hospital Trust Co.* and *First National Bank of Omaha*, returned the Board to what had been done in *Transatlantic Clock & Watch Co.*, holding that where a change is made from the specific charge-off method to the reserve method of accounting for bad debts the bad debts determined to be worthless and charged off during the year must be included in determining the deduction allowable for that year by the reserve method. So far as we have been able to determine, the Board has not since departed from the rule laid down to those cases and has allowed, in setting up a reserve, an amount sufficient to absorb the debts determined to be bad and charged off during the year. *Wade & Dunton Carriage Co.*, 21 B. T. A. 439; and *Abraham Sultan*, 22 B. T. A. 889. See also *Harry Kahn*, 17 B. T. A. 499, decided shortly before *First National Bank of Omaha, supra.* Cf. *National Mill Supply Co.*, 23 B. T. A. 1363.

In the instant case, the partnership, in making the change from the specific charge-off method to the reserve method, in setting up the reserve at December 31, 1937, and in charging thereto debts previously determined to be bad during the taxable year, apparently sought to comply with the pronouncements and conclusions in the cases cited above, in that it set up as "a reasonable addition" to the reserve an amount sufficient to absorb the debts determined to be bad and charged off during the year and to leave as the reserve for anticipated losses in the accounts remaining on the books an amount equal to 20 percent thereof. Actual experience of the partnership in 1938 indicates that the reserve so left on the books at the close of 1937 was not far wrong. Business in the area in which the partnership conducted its business had slumped during the latter part of 1937 and, of the accounts totaling $40,610.68 determined to be bad and charged off during the year, $21,683.55 was charged off between October 27 and the end of the year. On such facts the partnership concluded that a reserve of $55,624.28 was needed. Had the partnership been on the reserve basis already and had there been no question of change from the specific charge-off method, we seriously doubt that the respondent in his determination would have considered $55,624.28 as an unreasonable reserve in respect of the accounts receivable outstanding on December 31, 1937. There can be no question that $96,234.96, the amount of the deduction claimed, covers the bad debt requirements of the partnership for a two-year period and that deduction of the full amount in 1937 results in the distortion of net income for that year. It is the logical result, however, of the change from the specific charge-off method to the reserve

method of accounting for bad debts and is in keeping with the decisions cited above. Furthermore, under the statute and the regulation, it was within the discretion of the respondent to grant or withhold permission to make the change. Permission to make the change was granted with no conditions attached. The respondent should not now complain of the logical and natural consequences of an act which was wholly within his discretion. His contention herein is accordingly rejected.

*Decisions will be entered under Rule 50.*